HOPE D. LAUGHLIN, Plaintiff-Appellee, v. CHARLES W. FRANCE, as Ex'r of the Estate of Katherine L. DuPee, Deceased, *et al.*, Defendants-Appellants.

Second District   No. 2—92—0753

Opinion filed January 21, 1993.—Rehearing denied March 3, 1993.

James G. Madden, of Madden & Sisler, of Freeport, for appellants.

James E. Stevens and Michael J. Chmiel, both of Barrick, Switzer, Long, Balsley & Van Evera, of Rockford, for appellee.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Defendants, Arthur Lee Owen, Dianne Lee Cook and Charles W. France, as executor of the estate of Katherine L. DuPee (decedent), appeal after the trial court ordered that decedent's half of the proceeds from the sale of real estate inherited from her husband, John DuPee, should be transferred to plaintiff, Hope D. Laughlin. On ap-

peal, defendants contend that the testimony of plaintiff's two witnesses was inadmissible hearsay and that the evidence was insufficient to prove that the decedent orally agreed to execute a will leaving the subject real estate to plaintiff.

Plaintiff is the daughter of John DuPee, who died in November 1981, and the stepdaughter of Katherine DuPee, the decedent. Arthur Lee Owen and Dianne Lee Cook, defendants, are decedent's children. The property at issue is located at 1402 La Cresta Drive in Freeport, Illinois. On September 2, 1981, DuPee executed a will of which paragraph five is relevant. Paragraph five stated:

> "FIFTH: I give to my wife, KATHERINE L. DUPEE, the lifetime use of the real estate commonly known and described as 1402 La Cresta Drive, Freeport, Illinois, and all the income therefrom, and upon her death I devise said real estate to my duaghter [sic], HOPE D. LAUGHLIN. My wife, KATHERINE L. DUPEE, shall be solely responsible for the expenses of maintenance and protection of said real estate and for the payment of taxes thereon during her lifetime."

A codicil was executed on October 26, 1981, revoking paragraph five of the will. The codicil stated, in pertinent part, that 1402 La Cresta would be devised as follows:

> "(a) To my wife, KATHERINE L. DUPEE, One-half;
>
> (b) To my daughter, HOPE D. LAUGHLIN, One-half. It is my Will that my wife shall be permitted to personally reside in said residence as long as she desires, rent free. During the period she personally resides in said residence she shall be solely responsible for paying all of the taxes, insurance, utility bills, and all other expenses required to maintain said residence. When she no longer personally resides in said residence, or no longer wishes to personally reside in said residence, the residence shall be sold and the proceeds of the sale divided equally between my wife and my daughter, HOPE D. LAUGHLIN."

Presumably, after DuPee died in November 1981, decedent continued to live at 1402 La Cresta pursuant to the provisions of DuPee's will. On February 9, 1991, decedent died testate, leaving her interest in 1402 La Cresta to her children, Owen and Cook, in equal shares. Plaintiff then brought suit, claiming that decedent and DuPee entered into an oral contract at the time DuPee executed the codicil to his will. In her complaint, plaintiff alleged that decedent agreed to execute a will leaving her interest in 1402 La Cresta to plaintiff if not sold during decedent's lifetime. In consideration for that promise, DuPee executed the codicil leaving a one-half interest in 1402 La Cresta

to decedent. Plaintiff and all defendants entered into an agreement on April 16, 1991, to sell 1402 La Cresta. The real estate was sold and one-half of the proceeds, $38,558.86, was placed in an escrow account pending the outcome of plaintiff's action.

The first witness to testify at trial was Robert Carlile, a certified public accountant who did tax work for the DuPees. Carlile stated that he was the executor of DuPee's will. Over a hearsay objection, Carlile testified that DuPee told him that, after his death, DuPee intended that decedent was to have the use of 1402 La Cresta as long as she lived and then it was to go to plaintiff. DuPee owned the house before he married decedent.

Carlile further testified that in October 1981 Carlile was asked through DuPee's attorney, Shirl Laughlin, to meet with DuPee in his hospital room at Freeport Memorial Hospital. Shirl Laughlin is also the husband of plaintiff, Hope Laughlin. Present at the meeting on October 23 were DuPee, Laughlin, Carlile and decedent. Laughlin stated that he thought there was an estate tax problem concerning the disposition of the 1402 La Cresta property in DuPee's original will. Estate taxes could be saved if the property was distributed differently. Carlile testified that DuPee approved the codicil giving a one-half interest in 1402 La Cresta to decedent because the change would save on estate taxes. However, he still had the desire that the property would go to plaintiff after decedent's death. Carlile acknowledged that the estate tax problem in the original will pertained to the marital deduction.

Carlile further testified that DuPee recommended to decedent that she change her will. DuPee said that decedent should change her will so the property went to the plaintiff upon decedent's death. Decedent indicated that she would change her will. Carlile stated that he asked decedent if she understood that she had to change her will, and she replied affirmatively.

Carlile again met with Laughlin, DuPee and decedent at Freeport Memorial on October 26, 1981. DuPee and decedent discussed executing the codicil to DuPee's will. According to Carlile, DuPee told decedent that it was necessary for decedent to change her will in order to save on estate taxes. Decedent was supposed to change her will and give 1402 La Cresta to plaintiff. Decedent responded affirmatively. Thereafter, the codicil was executed.

Carlile spoke with decedent after DuPee's death in November 1981 and asked her if she had changed her will yet. Decedent responded that she had an appointment or was in the process of making an appointment to have her will changed. This conversation took

place during the time Carlile was preparing the DuPees' 1981 tax return, which was approximately April 1982.

On cross-examination, Carlile stated that the codicil was written in the same form as was contemplated in the October 23, 1981, meeting. Carlile acknowledged that in his deposition he stated that he was not sure whether decedent was at the meeting on October 26. Carlile stated that Laughlin explained the codicil, and the codicil was passed around for each person to read. Carlile explained that the original will had a life estate in 1402 La Cresta for decedent, which did not meet the requirements for the marital deduction. DuPee and decedent intended that the marital deduction apply to the property, so the codicil was drafted. On October 26, all four people assumed and agreed that the codicil had achieved that purpose.

Carlile also testified that Laughlin indicated during the October 23, 1981, meeting and possibly during the October 26 meeting that putting a clause in the codicil giving plaintiff the property after decedent's death would have destroyed the marital deduction.

Neva Junior, a friend of decedent, testified that she and decedent had two or three conversations about 1402 La Cresta after DuPee died. Over a hearsay objection, Junior stated that decedent would refer to the property as "Hope's house." Junior could not recall in what context decedent made this statement, but recalled that repairs were being made for the sale of the property. Decedent referred to the property as "Hope's house" in various conversations with Junior. Junior did not hear decedent say that the house was plaintiff's when decedent died.

After the court denied defendants' motion for judgment at the close of plaintiff's case, defendants called Shirl Laughlin, plaintiff's husband and the attorney who drafted DuPee's will and codicil. Laughlin testified that he is a sole practitioner who has prepared between a dozen and two dozen Federal estate tax returns. Laughlin recalled preparing DuPee's will and codicil and stated that he was present when the codicil was signed by DuPee in a hospital room at Freeport Memorial Hospital on October 26, 1981. Present at the execution of the codicil were DuPee, decedent, Carlile and Laughlin.

Laughlin further testified that discussions about creating a codicil to DuPee's will began on October 16, 1981, at Freeport Memorial. A second discussion occurred on October 23, 1981. At that meeting, Laughlin was instructed to include in the codicil a clause stating that if 1402 La Cresta was not sold at the time of decedent's death, the entire property was to go to plaintiff. Laughlin did not put this clause in the codicil he drafted because he thought it would destroy the mari-

tal deduction. However, Laughlin testified that the marital deduction was not discussed during the October 23 meeting. It was not until the October 26 meeting when Laughlin presented the codicil to DuPee that the marital deduction was first discussed. Neither DuPee nor decedent objected to the language of the codicil and the use of the marital deduction after Laughlin explained it to them. Then the following colloquy took place:

"Q. [DuPee] accepted your deletion of what you had been instructed to do after your explanation about the marital deduction. Is that correct?

A. After that and a further explanation.

Q. What was the further explanation?

A. That [decedent] would make a will leaving this half of the house to [plaintiff], and it would not, in my opinion, destroy the marital deduction.

Q. That [decedent] could make a will? Is that what you said?

A. Could, should, however you—.

* * *

Q. First of all, let me go back then. It was explained that she could make a will leaving the half to [plaintiff]? Is that correct?

A. I believe you have my notes, and it says should in the notes.

* * *

Q. You never told her that she should make a will, did you?

A. I believe my notes say that I did."

Laughlin further testified that he did not represent decedent at that time and did not recall suggesting to her that she consult an attorney about what was being proposed. However, Laughlin stated that no one, including himself, told decedent that she was "required" to change her will.

Laughlin stated that he prepared DuPee's Federal estate tax return. While preparing the return, Laughlin never considered whether there was a binding contract between DuPee and decedent requiring decedent to leave her one-half interest in 1402 La Cresta to plaintiff. If there were a binding agreement, Laughlin said he would have had to research whether DuPee's estate could take the marital deduction.

Laughlin did not research that issue because he gave no consideration to whether a contract existed. However, Laughlin reiterated that if the codicil contained a clause giving plaintiff the decedent's one-half interest in 1402 La Cresta upon decedent's death, that could "very possibly" destroy the marital deduction. Laughlin said he would

have to research whether a written contract between DuPee and decedent would have had the same effect.

Laughlin further testified that he had no confidence that decedent was going to change her will. However, Laughlin did suggest to decedent, before the meeting on October 26, 1981, that she should execute a codicil to her will. Laughlin recalled decedent stating in his presence that she was going to make a new will, but she did not say she was changing the will to leave her one-half interest in 1402 La Cresta to plaintiff. However, she made this statement after being told that to obtain the advantages of the marital deduction, and to ultimately give the property to plaintiff, decedent should change her will leaving her one-half interest in the property to plaintiff.

On cross-examination, Laughlin testified that his instructions from DuPee on October 23 were to draft a codicil giving one-half of 1402 La Cresta each to decedent and plaintiff. Further, if the one-half interest belonging to decedent was not sold by her at her death, it was to go to plaintiff. Laughlin left the final clause out of the codicil because it would have destroyed the marital deduction. While explaining this change in the codicil to DuPee and decedent, Laughlin told decedent that the goal of DuPee's suggested codicil would be achieved if decedent changed her will to leave her one-half interest in 1402 La Cresta to plaintiff. That way, the marital deduction could be taken on DuPee's tax return, and when decedent died, decedent's interest in 1402 La Cresta would be taxable to her estate. Decedent agreed to change her will before DuPee signed the codicil.

The trial judge issued two memorandum opinions. The first opinion addressed defense counsel's hearsay objections during the testimony of Robert Carlile and Neva Junior. The trial judge ruled that both witnesses' testimony was hearsay, but fell within an exception to the hearsay rule. The testimony related to the states of mind of decedent and DuPee and was admissible to show their intentions as to the eventual disposition of the property.

In the second memorandum opinion, the trial judge found that plaintiff proved by clear and convincing evidence the existence of an oral agreement between decedent and DuPee that decedent make a will leaving her one-half interest in 1402 La Cresta to plaintiff. The trial judge found Robert Carlile's testimony to be the most significant concerning the exchange of promises between DuPee and decedent. Thus, the court ordered the executor of decedent's estate to transfer the $38,558.86 from the escrow account, including any accrued interest, to plaintiff. Thereafter, defendants filed a timely appeal.

The first issue we will address is whether the testimony of Robert Carlile was inadmissible hearsay. Neither party disputes the fact that the testimony was hearsay, but there is a dispute whether the testimony fell within an exception to the hearsay rule. Defendants contend that the declarations of decedent testified to by Carlile were not statements of intent admissible under an exception to the hearsay rule because to be admissible, it must be proven that the act intended was actually performed. Further, the trial court admitted Carlile's testimony as decedent's state of mind, which defendants claim was erroneous because declarations proving state of mind are not admissible to prove the facts stated.

Plaintiff contends that Carlile's testimony was admissible and could be used to show DuPee's and decedent's intent to enter into an oral agreement. The testimony met the two requirements for its admissibility, namely, that the declarant was unavailable and there was a reasonable probability that the testimony was truthful.

■ Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 447.) Generally, hearsay is inadmissible unless it falls within an exception to the rule. (*People v. Sanchez* (1989), 131 Ill. 2d 417, 423.) Statements which indicate a declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable and it is reasonably probable that the proffered statements are truthful. (*People v. Floyd* (1984), 103 Ill. 2d 541, 546; contra M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.4, at 633 (5th ed. 1990) ("The disturbing indication that this hearsay exception [state of mind] requires that the declarant be unavailable, [citations], is incorrect, ill-advised and accordingly should not be followed").) "[H]owever, the declarant's state of mind must be relevant to a material issue in the case." *Floyd*, 103 Ill. 2d at 546.

■ We agree with plaintiff that Carlile's testimony was admissible to show DuPee's and decedent's intent to enter into an oral agreement, and to prove that the agreement was made. Defendants cite 29 Am. Jur. 2d *Evidence* §651 (1967) as authority that declarations of intent are inadmissible in the absence of proof of performance of the act to which it relates. However, defendants failed to cite the portion of section 651 that we find applicable:

> "[I]n a case where the fact in issue is whether a particular act was performed, a declaration indicating a present intention to do the particular act in the immediate future, made in apparent good faith and not for self-serving purposes, is admissible, not as a part of the res gestae but as relevant to the fact in issue,

to prove that the act was in fact performed." 29 Am. Jur. 2d *Evidence* §651 (1967).

█ Here, the fact at issue is whether DuPee and decedent entered into an oral agreement requiring decedent to leave her interest in 1402 La Cresta to plaintiff. Carlile testified about decedent's and DuPee's intentions to enter into the agreement in the immediate future, *i.e.*, before DuPee signed the codicil. Thus, Carlile's testimony is admissible to prove the agreement was made.

A case we found to be analogous to our situation is *Lee v. Central National Bank & Trust Co.* (1974), 56 Ill. 2d 394. There, our supreme court held that a letter written by the declarant evidencing an oral antenuptial agreement between the declarant and her second husband was admissible to prove the existence of the oral agreement. (*Lee*, 56 Ill. 2d at 400.) Here, following that rationale, Carlile's testimony of decedent's intent to enter into an oral agreement with her husband, DuPee, is also admissible to prove the existence of such an agreement.

Defendants argue that *Hackett v. Ashley* (1979), 71 Ill. App. 3d 179, 187, is authority for the proposition that evidence of state of mind or intent is admissible only for the limited purpose of proving state of mind and not for proving the facts stated. The *Hackett* court relied on *Wilkinson v. Service* (1911), 249 Ill. 146, in which our supreme court stated:

> "The rule is well established in this State that the declarations of the testator are competent, *in a contest involving the validity of his will*, to show the state of mind but not to prove the facts stated. *** The truth or falsity of such statements is of no consequence. They are to be used only as showing the condition of his mind." (Emphasis added.) (*Wilkinson*, 249 Ill. at 151.)

The *Hackett* court relied on a hearsay rule used in will contests. Because of the rule's limited applicability and the other authority we found to be controlling, we choose not to follow *Hackett*.

█ Defendants next contend that the testimony of Neva Junior was inadmissible hearsay. Before trial, plaintiff argued, and apparently the trial judge agreed, that Junior's testimony was admissible as a declaration against interest by decedent. In his memorandum opinion, the trial judge found Junior's testimony admissible to show decedent's intentions. Defendants now argue that the testimony did not meet the requirements of the declaration against interest exception because decedent's statement that 1402 La Cresta was plaintiff's

house was not against her pecuniary interest when the statements were made.

Plaintiff counters that Junior's testimony was admissible under the state of mind exception to the hearsay rule. Junior's testimony evidenced decedent's intention that 1402 La Cresta belong to plaintiff after decedent's death. Plaintiff also argues that Junior's testimony was a declaration against interest by decedent.

To be admissible as an exception to the hearsay rule, a declaration against interest must meet four requirements. The declarant (1) must be unavailable at trial, (2) must have possessed knowledge of the facts about the declaration, (3) must have made a statement against his or her pecuniary interest, and (4) must have had no motive to lie. (*Seward v. Griffin* (1983), 116 Ill. App. 3d 749, 758; *Buckley v. Cronkhite* (1979), 74 Ill. App. 3d 487, 490.) "A declaration must be against one's pecuniary interest at the time the statement is made or it fails to qualify as an exception to the hearsay rule." *Buckley*, 74 Ill. App. 3d at 492.

We agree with defendants that decedent's statement to Junior that 1402 La Cresta was "Hope's house" was not against her pecuniary interest when made. At the time of that statement, DuPee had devised 1402 La Cresta in equal shares to plaintiff and decedent. So when decedent stated that the house was plaintiff's, she was stating a fact, albeit an unclear one. The house was indeed owned by plaintiff as well as decedent. We do not believe that such a benign statement suggests a declaration against interest.

Plaintiff argues that decedent's statement was against her present pecuniary interest, citing *Gage v. Eddy* (1899), 179 Ill. 492. We find the *Gage* case distinguishable because the statement made by the declarant, that he could not quitclaim his interest in the property because he did not have title to it, was a clear statement against his interest. (*Gage*, 179 Ill. at 497-98.) Here, decedent's statement that 1402 La Cresta was "Hope's house" does not necessarily evidence a relinquishment of her interest in the property.

Further, we also find that Junior's testimony is not admissible as a statement of decedent's intent. We have already discussed the law on admissibility of declarations of state of mind and find that Junior's testimony is not admissible under that hearsay exception. The relevancy of Junior's testimony is difficult to determine without putting it into context. However, Junior was unable to testify to the circumstances surrounding decedent's statement. Without an understanding of the circumstances surrounding decedent's statement that the property was "Hope's house," the statement provides no insight into dece-

dent's intent. Thus, we hold that the trial court erred in admitting the testimony as an exception to the hearsay rule.

Defendants' final contention is that the evidence presented at trial was insufficient to prove the existence of an oral agreement between DuPee and decedent. Defendants argue that Carlile's testimony only proves that DuPee executed a codicil to his will to take advantage of the marital deduction. Defendants also claim that Laughlin's testimony that he did not believe that an oral contract existed is further support that no contract existed.

Plaintiff contends that there was clear and convincing evidence that DuPee executed his codicil in exchange for decedent's promise to change her will to leave her one-half interest in 1402 La Cresta to plaintiff. Plaintiff argues that the elements needed to create a contract—certainty, mutual assent, and consideration—are all present. Finally, plaintiff claims the testimony of Carlile and Laughlin supported the trial court's finding.

A contract to make a will is enforceable if supported by valid and adequate consideration. (*In re Estate of Spaulding* (1989), 187 Ill. App. 3d 1031, 1035.) If the contract was made orally, it must be proven by clear, explicit, and convincing evidence in terms certain and unequivocal. (*Greenwood v. Commercial National Bank* (1955), 7 Ill. 2d 436, 440; *Kahn v. First National Bank* (1991), 216 Ill. App. 3d 272, 276.) The burden of proof is on the party attempting to establish the contact. (*Greenwood*, 7 Ill. 2d at 441.) The existence of an oral contract, its terms, and the intent of the parties are questions of fact determined by the trier of fact, which will not be reversed unless against the manifest weight of the evidence. *Howard A. Koop & Associates v. K P K Corp.* (1983), 119 Ill. App. 3d 391, 400.

Contracts to dispose of property by will "do not stand on an especially favored footing," and courts more strictly examine the nature and circumstances of such agreements. (*Monninger v. Koob* (1950), 405 Ill. 417, 423; 36 Ill. L. & Prac. *Wills* §6 (1958).) Also, the fact that one of the promisors executes a will disposing of property in contradiction with the oral agreement is a circumstance to consider in deciding whether the oral contract exists. *Anson v. Haywood* (1947), 397 Ill. 370, 378.

■ With the above rules in mind, we hold that the trial court's finding that an oral agreement existed was not against the manifest weight of the evidence. Carlile's testimony about the discussion between decedent and DuPee is sufficient evidence of a contract to make a will. Carlile testified that on October 23, 1981, Laughlin informed DuPee that he could avoid excessive Federal estate taxes if he

made a codicil giving a one-half interest in 1402 La Cresta to his wife, decedent. Because DuPee desired that plaintiff eventually obtain 1402 La Cresta outright, he recommended to decedent that she change her will and devise her one-half fee interest in the property to plaintiff. Decedent agreed.

On October 26, 1982, in DuPee's hospital room, Laughlin presented the codicil. Before signing the codicil, DuPee told decedent that it was necessary that she change her will to save on estate taxes. When decedent agreed, the codicil was signed.

Carlile's testimony is clear and convincing evidence that not only was saving on estate taxes a concern, but also that the property ultimately be owned by plaintiff. In fact, Carlile testified that DuPee intended that the property be plaintiff's. As the trial court stated in its memorandum opinion, Carlile's testimony showed that DuPee relied on decedent's promise to change her will before executing the codicil to change the disposition of the premises.

Further, the trial court believed that Laughlin's testimony essentially corroborated Carlile's testimony. Laughlin's testimony focused primarily on the Federal estate tax marital deduction. However, Laughlin did testify that the marital deduction was not discussed during the October 23 meeting, implying that DuPee wished to change his will not for purposes of saving on Federal estate taxes but because of a desire to change the ultimate disposition of the property. Although Laughlin's testimony does not corroborate Carlile's entire version of events, Laughlin recalled decedent stating that she was going to change her will before DuPee executed the codicil.

Additionally, we find Laughlin's testimony curious for two reasons. First, Laughlin is married to plaintiff, yet his testimony generally supported the theory that no oral contract existed, a position in direct conflict with his wife's interests. Second, Laughlin's testimony concerning the effects of the marital deduction in this situation was vague and somewhat evasive. Essentially, Laughlin testified that DuPee's estate could take a marital deduction if DuPee devised one-half of 1402 La Cresta to decedent and decedent changed her will to devise that interest to plaintiff upon decedent's death. Laughlin further testified that he told decedent she "should" change her will, but that she was not "required" to do so. Finally, Laughlin testified that he did not research whether the marital deduction could be taken if the surviving spouse was obligated to leave the property to a third person.

We discuss Laughlin's testimony not to determine its weight and believability, which is a task solely within the province of the fact

finder (see *Ruggio v. Ditkowsky* (1986), 147 Ill. App. 3d 638, 643-44), but to decide whether the oral agreement is enforceable. Courts will not enforce a contract that is contrary to public policy. (*O'Hara v. Ahlgren, Blumenfeld & Kempster* (1989), 127 Ill. 2d 333, 341.) In deciding whether an agreement violates public policy, courts must determine whether the contract "is so capable of producing harm that its enforcement would be contrary to the public interest." (*In re Estate of Braun* (1991), 222 Ill. App. 3d 178, 182.) The public policy of this State is found in its constitution, its statutes and its judicial decisions. (*O'Hara*, 127 Ill. 2d at 341.) Whether a contract is contrary to public policy depends on the particular facts and circumstances of each case. *In re Estate of Braun*, 222 Ill. App. 3d at 182.

We believe that enforcing the oral agreement made between DuPee and decedent would violate public policy. A binding agreement entered into by the surviving spouse as beneficial owner to dispose of a property interest obtained from the decedent prevents taking the marital deduction. (26 C.F.R. §20.2056(e)—2(a)(5) (1992).) Implicit throughout the testimony in this case is the fact that DuPee's estate took a marital deduction for the 1402 La Cresta property. If we enforce the contract which required decedent to change her will to devise her interest in the property to plaintiff, DuPee's estate would have received the benefit of the marital deduction when, pursuant to Internal Revenue Service regulations, it should not have done so.

The public policy in this State is that the laws of the United States are binding on and should be followed by the citizens of Illinois. (See *People ex rel. Woll v. Graber* (1946), 394 Ill. 362, 369-70.) As such, we reverse the judgment of the trial court and award the proceeds in escrow from the sale of 1402 La Cresta, the sum being $38,558.86, to defendants.

For the foregoing reasons, the judgment of the circuit court of Stephenson County is reversed, and the defendants are awarded the proceeds in escrow, $38,558.86, from the sale of 1402 La Cresta.

Reversed.

BOWMAN and DOYLE, JJ., concur.